538 So.2d 559 (1989)
LOUISIANA STATE BAR ASSOCIATION
v.
Henry KLEIN.
Nos. 87-B-2233, 87-B-2455.
Supreme Court of Louisiana.
January 30, 1989.
Thomas O. Collins, Jr., G. Fred Ours, New Orleans, Gerard F. Thomas, Natchitoches, Roland J. Achee, Shreveport, Robert J. Boudreau, Lake Charles, Robert M. Contois, New Orleans, Frank J. Gremillion, Baton Rouge, Carrick R. Inabnett, Monroe, Harvey Lewis, New Orleans, Alfred S. Landry, New Iberia, Philippi P. St. Pe', Metairie, Trevor G. Bryan, Elizabeth A. Alston, New Orleans, Christine Lipsey, Baton Rouge, Counsel for applicant.
*560 Henry L. Klein, Cecil M. Burglass, Jr., New Orleans, for respondent.
LEMMON, Justice.
This is a disciplinary proceeding by the Louisiana State Bar Association, through its Committee on Professional Responsibility, against one of its members based on alleged violations of the Code of Professional Responsibility.[1] The proceeding involves respondent's alleged misconduct in two separate matters.
The Shaw Matter
Lloyd Azcona was respondent's client. Azcona and his brother had inherited certain immovable property which they sold in 1978, receiving a promissory note payable to both in the amount of $340,000. The note, which was secured by a mortgage on the property, provided for sixty monthly payments of $3,800.00 and a final balloon payment of the balance of the principal and interest. The note was eventually placed with a bank for collection.
Azcona and his wife, now Jill Shaw, were legally separated in 1979 and eventually were divorced. In the community property settlement Shaw disclaimed any ownership interest of the note, which was Azcona's separate property.
In January, 1982, Shaw obtained a judgment for $6,204.96 against her former husband for past due alimony and child support. On Azcona's instructions the bank which held the 1978 note began forwarding Azcona's share of the payments directly to Shaw, and the funds were applied to Azcona's child support obligation.
In December, 1982, Azcona borrowed approximately $112,000 from John Olagues and transferred his interest in the balloon payment of the 1978 note (which was to become due in 1983) to Olagues in payment of the loan.[2] Azcona subsequently notified the bank to discontinue sending his share of the note payments to his former wife.
In October, 1983, Shaw filed a civil action for the "loss of the proceeds" of the note and other damages against Azcona, Azcona's brother, and the bank.[3] Olagues intervened in the action, claiming ownership of one-half of the balloon payment pursuant to the 1982 transfer. Respondent, representing Azcona, filed an answer to this intervention and acknowledged the 1982 transfer which formed the basis of Olagues' claim.
In the same action the bank filed a petition for a concursus proceeding and deposited the note into the registry of court.[4] The mortgagor intervened in the concursus proceeding, claiming an offset against the balance due on the note because of redhibitory defects in the property.
Although the mortgagor desired to pay off the note and remove the mortgage from the property, and Azcona's brother desired to receive his undisputed one-half interest in the payment due by the mortgagor, procedural maneuvers to accomplish these simple objectives were constantly obstructed by actions characterized in the commissioner's report as an "antagonistic attitude" and "senseless feuding" by Shaw's attorney. After the scheduled trial date of the civil action in January, 1985 had been continued by Shaw over objections by the other parties, respondent filed a motion to sever the concursus action from the damage action. When that motion was denied on March 1, 1985, respondent and attorneys representing the other parties contacted the attorney for the recorder of mortgages about the procedure necessary to pay a note held in the registry of court and to cancel a mortgage securing the note. The *561 attorney indicated that a simple court order would be sufficient.
After several meetings to discuss the method of accomplishing payment of the note and cancellation of the mortgage, all parties to the action, except Shaw and the bank, met with their attorneys at the courthouse on June 17, 1985. Respondent typed an ex parte motion "to remove said note from the registry of the Court for the sole purposes of exhibiting same to the recorder of Mortgages and for the purposes of evidencing payment of said note this date, said note to be returned to the registry of the Court immediately upon cancellation of the Mortgage securing same." The motion was signed by the two payees of the note, but not by the attorneys.
Because the judge to whom the case was assigned was not available that afternoon, respondent presented the motion to another judge. After determining from respondent that there was no objection by the clerk of court or recorder of mortgages to the withdrawal and cancellation of the note, the judge signed the order.
Upon presentation of the order, the clerk of court released the note to respondent who gave it to the mortgagor's attorney. In accordance with an agreement compromising the mortgagor's quanti minoris claim, the note was marked "paid", and the mortgagor sent for a check from his new lender to pay the approximate balance on the note of $274,000, less a $24,000 set-off attributable to defects in the property repaired by the mortgagor.[5] The note was presented to the recorder of mortgages, who cancelled the mortgage, and then returned to the clerk of court, who again placed it in the registry of court. Respondent and his client left the courthouse before the mortgagor's check arrived.
Azcona's brother's attorney, upon receiving the mortgagor's check, did not deposit the funds into the registry of court, but instead placed the funds in his trust account. He then disbursed the funds, one-half to Azcona's brother and one-half to Olagues.[6] Respondent was not a party to the disbursement or to the agreements concerning the procedure for disbursing the funds. According to respondent, he believed Azcona's brother's attorney was going to hold the funds in his trust account until he had written authority from all parties. He was aware, however, that the attorney was not going to deposit the funds into the registry of court.
In connection with these events respondent was charged with preparing the motion to withdraw the note from the registry of court without notifying the attorneys for all parties to the concursus proceeding; presenting the motion to the judge without advising the judge that the note was the subject of a concursus proceeding; failing to advise the judge that all parties had not been consulted; withdrawing the note from the registry of court and obtaining cancellation of the note, knowing that a portion of the proceeds of the balloon payment were in dispute; cancelling the note without notifying all parties in the case; participating in an agreement whereby the proceeds of the balloon payment were distributed to some, but not all, of the claimants; and failing to ensure that the proceeds were deposited into the registry of court. According to the Bar Association, these actions and omissions constituted (1) the circumvention of a disciplinary rule through the actions of another, in violation of DR 1-102(A)(2); (2) conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of DR 1-102(A)(4); (3) conduct that is prejudicial to the administration of justice, in violation of DR 1-102(A)(5); (4) conduct that adversely reflects on respondent's fitness to practice law, in violation of DR 1-102(A)(6); (5) action on behalf of his client which he knew or should have known would serve merely to harass or maliciously injure another, in violation of DR 7-102(A)(1); and (6) assisting *562 his client in conduct that he knew to be illegal or fraudulent, in violation of DR 7-102(A)(7).
The commissioner appointed by this court aptly observed that the fault in this case lay with many people, as will be discussed later in mitigation. However, the commissioner found that respondent's violations of DR 1-102(A)(5) and (6) and DR 7-102(A)(1) had been proved.[7]
The commissioner concluded that respondent's participation in the withdrawal and cancellation of the note, without the consent of all parties and with the awareness that the funds in payment of the note were not to be deposited into the registry of court, "rendered the subject of the concursus valueless", thus constituting conduct prejudicial to the administration of justice in violation of DR 1-102(A)(5). The commissioner further stated that this interference with the normal judicial process reflected upon respondent's fitness to practice law and thus violated DR 1-102(A)(6). As to the violation of DR 7-102(A)(1), the commissioner, after grappling with the word "malice", concluded that respondent's actions evidenced ill will and a purpose to harm another party in the suit, noting that respondent knew Shaw had made a claim to the note and further knew cancellation of the note without depositing the funds into the registry of court would prejudice Shaw's claim.
The commissioner recommended that respondent be suspended for three months for these violations. The Bar Association concurred in the commissioner's findings of facts and conclusions of law, except the finding that respondent's conduct did not violate DR 1-102(A)(4).
The evidence does not establish clearly and convincingly that respondent's participation in the withdrawal of the note and the cancellation of the mortgage was merely to harass or maliciously injure Shaw. Respondent's client, although not entitled to receive any of the proceeds of the balloon payment, had an interest in having the matter resolved. He had formally transferred his interest in the note to Olagues to pay off a large debt. The other parties were frustrated at the lack of progress in the litigation and the seeming injustice of a mortgagor's not being able to pay off a mortgage and a payee's not being able to collect payment of an undisputed claim. In conjunction with the attorneys for the mortgagor and for Azcona's brother, respondent acted (although improperly) with the intent to accomplish these purposes.
The gravamen of a violation of DR 7-102(A)(1) is conduct motivated by evil intent to inflict suffering without reason or justification.[8] While the course of action chosen by respondent and others was improper for several reasons, it was not done merely to harass Shaw or merely with the evil intent to injure Shaw. See Louisiana State Bar Association v. Estiverne, 512 *563 So.2d 417 (La.1987). We conclude the Bar Association did not prove that respondent's actions violated DR 7-102(A)(1).
Nevertheless, respondent was guilty of some misconduct. The significant impropriety in this case was the failure, after cancellation of the note by payment rendered that instrument valueless in the concursus proceeding, to deposit the payment proceeds into the registry of court.
Respondent and the attorney for Azcona's brother disagreed over the responsibility for this failure. The latter had theorized that since Shaw had not made any formal demand in the concursus proceeding claiming an interest in the note, she was not entitled to any proceeds of the balloon payment. He testified that he was led to believe respondent's motion had set forth this theory and that the court order (which he contended he never saw) authorized cancellation of the note and disbursement of the proceeds in accordance with this theory. Respondent, on the other hand, while agreeing that only Azcona's brother and Olagues had made formal claims in the concursus proceeding, testified that he understood the attorney for Azcona's brother was to hold all funds in the trust account until all parties agreed on the disbursement.
The handling of the matter by both attorneys left much to be desired. Both attorneys should have known that the ex parte motion was highly improper. Whether or not the attorney for Azcona's brother read the motion and order (which he certainly should have done), he knew the order was obtained by ex parte motion. Both attorneys also should have known that the appropriate procedure for challenging the sufficiency of Shaw's pleading in the concursus proceeding (which had apparently been successful in blocking the claims by Azcona's brother and by Olagues) was by contradictory motion directly raising the issue and affording Shaw notice and an opportunity to be heard. Such a motion would have been heard summarily, and supervisory review was immediately available. Thus, the use of an ex parte motion (planned in advance by all involved attorneys) must have involved an intent to conceal from Shaw the motion to pay the note and cancel the mortgage.
Nevertheless, the true prejudice to Shaw occurred not because the note was paid and the mortgage cancelled under the authority of the improper motion and order, but because the net proceeds of the balloon payment were disbursed to some claimants rather than deposited into the registry of the concursus proceeding. Respondent's admitted awareness that the attorney for Azcona's brother was not going to deposit these funds, combined with his participation in the improper ex parte motion, constituted violations of DR 1-102(A)(5) and (6).
Finally, the Bar Association did not prove by clear and convincing evidence that respondent violated DR 1-102(A)(4) by making misrepresentations to the judge who signed the order. Respondent correctly told the judge that there were no objections from the clerk or the recorder. Furthermore, the judge did not remember whether respondent told him the note was in the registry of court pursuant to a concursus proceeding, but noted he knew of no reason why anyone would object to a mortgagor's paying a note in the registry of court. Moreover, there does not appear to be anything deceitful about presenting such a motion to any available judge or about the fact that the motion was signed by the parties rather than their attorneys. Respondent typed the motion in the clerk's office where he was well known, the trial judge wrote respondent's name on the motion, and respondent signed his name to the receipt stamped on the motion. Inasmuch as respondent was informed by the attorney for the recorder of mortgages that a note in the registry of court could be paid and the mortgage cancelled by obtaining a court order, respondent's conduct in obtaining the order to pay the note and cancel the mortgage did not in itself violate the disciplinary rules pertaining to misrepresentation and deceit and would not have caused injury but for the failure to deposit the balloon payment into the registry of court.
*564 The Schulz Matter
In October, 1983, respondent and Lloyd Azcona transferred certain undeveloped immovable property, which had originally been purchased in their individual names, into the name of Paraphernal Properties, Inc. At the time respondent had accepted responsibility for incorporating the business under that name for Azcona and himself, but had not yet done so.
On December 5, 1983, the corporation, still not formally incorporated, borrowed $50,000 from a bank and executed a collateral mortgage on the immovable property. Respondent acted as notary public in passing the act of collateral mortgage, which was eventually recorded on June 6, 1984.
The articles of incorporation and initial report were filed with the Secretary of State in March, 1984. Respondent was listed as the president, a member of the board of directors, a shareholder of fifty per cent of the stock, and the agent for service of process. These documents were never filed in the mortgage office of the parish, as required by law.
Azcona, who was a contractor and real estate agent, negotiated with Lynda Schulz to purchase a portion of the property from the corporation and to use Azcona's construction company to build a day care center on the vacant property. Schulz agreed to purchase the pertinent lot for $35,000 and paid Azcona $7,000 toward the purchase price.
In the meantime Azcona and respondent had been working on a plan to refinance the existing mortgage and to build townhouses on the remainder of the property.[9] The refinancing, of course, would entail paying off the collateral mortgage. In late 1984 they obtained a commitment for a loan to complete the project.
In March, 1985, Azcona and Schulz were ready to pass the act of cash sale. In order to save costs Schulz consented to respondent's acting as the notary public for the sale, although she was informed of respondent's position as part owner of the property. Azcona made the arrangements with respondent, and Schulz appeared at respondent's office on March 6, the only time these two parties ever met. Schulz, who was not represented by counsel or accompanied by a real estate agent at the act of sale, paid an additional $10,000 toward the purchase price.[10] She also paid $184.00 as a notary fee and costs to respondent.
Schulz paid the remaining $18,000, plus interest, on April 25, 1985. All funds received from the sale were deposited by Azcona in the corporate account in Mississippi. The act of sale was recorded on July 1, 1985.
Neither Azcona nor respondent ever informed Schulz that the portion of the property being purchased was subject to the previous mortgage on the entire property. Furthermore, although the act of sale contained a waiver of certificates, respondent assured Schulz that all recitations in the act were "just standard".[11]
After the sale to Schulz, the title examiner for the refinancing lender discovered a defect in the title caused by the corporation's acquisition prior to its legal incorporation. Another title examiner hired by respondent stated his opinion in May, 1985 (just after Schulz's final payment) that the title defect could not be cured.[12] Because *565 of this defect, the corporation's loan commitment for refinancing the project was withdrawn, and the corporation could not cancel the existing collateral mortgage on the entire property which, of course, also affected Schulz's portion of the property. In the meantime Schulz's application for financing her building had been rejected. To further complicate matters Azcona went into bankruptcy.
Faced with these seemingly insurmountable problems caused largely by his own neglect, respondent sought to cure the title problem by entering into an agreement with the mortgagee bank for a "friendly foreclosure" against the corporation on the entire property, including Schulz's portion.[13] (Although the payments on the collateral mortgage were current, it was believed that foreclosure against the corporation would free the property of the title defect.) Respondent further discussed the entire problem with a real estate agent who was representing Schulz and agreed to list the property jointly with Schulz if he was successful in reacquiring it after the foreclosure. The foreclosure sale took place in April, 1986.
After the foreclosure, however, Schulz decided to file a civil action against respondent. The suit, filed in November, 1986 sought rescission of the sale and damages. Schulz also filed a complaint with the Bar Association.
Respondent immediately contacted Schulz's attorney and agreed to "make her whole". He offered to pay her the purchase price and all interest and expenses, or to restore her to possession of the property she had purchased, title to which was then held by the bank.[14]
Respondent persisted in his attempts with Schulz to "make her whole", as shown by letters proffered in the record. However, he refused to pay demands by Schulz's first attorney far in excess of her actual losses. The matter was further delayed by her changes of attorneys. Finally, in April, 1987, Schulz's attorney offered to settle the matter for $45,000, and respondent immediately accepted the offer. When he had difficulty raising the funds to complete the settlement, respondent allowed a consent judgment in that amount to be taken in July, 1987. In December, 1987, respondent satisfied this judgment by paying the full amount to Schulz.
The Bar Association charged respondent, in his capacity as notary public, with passing an act of collateral mortgage by the corporation three months before the articles of incorporation were filed with the Secretary of State; passing an act of sale from the corporation to Schulz of a portion of the property included in the mortgage, without disclosing to Schulz the existence of the mortgage; and failing to record the March, 1985 act of sale until July 1, 1985. The Association asserted that respondent violated DR 7-104(A)(2) by giving advice, other than the advice to secure counsel, during the course of representation of one party to another person who was not represented by a lawyer, when the interests of such person had reasonable possibility of being in conflict with the interests of his client; violated DR 6-101(A)(3) by neglecting a legal matter entrusted to him; and violated DR 1-102(A)(4) and (6) by engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation, and engaging in conduct that adversely reflected upon his fitness to practice law.
The Commissioner found that respondent:
"(1) Ignored the incorporation of a business, for which he accepted responsibility, and failed to confirm the existence of *566 the corporation before arranging for the transfer of immovable property into the name of that non-existent corporation;
"(2) Executed as a notary public a collateral mortgage in which the mortgagor was a non-existent corporation, for which he had the responsibility of incorporating and with which he was financially involved;
"(3) Failed to record a collateral mortgage, which he passed as a notary, for over six months (see La.C.C. 3370);
"(4) Failed to record in the Parish Mortgage Office a copy of the certificate of incorporation, a certified copy or duplicate original of Articles of Incorporation, and the Corporation's Initial Report (see La.R.S. 12:25(d));
"(5) Unilaterally included a waiver of certificates in an act of sale without the earlier consent of, or any conversation with, the vendee, knowing that he would be required to convince the vendee, who was unrepresented, to waive those rights;
"(6) Failed to disclose to a vendee a mortgage against the subject property, although he had knowledge of the mortgage and had an interest in that mortgage;
"(7) Misrepresented to an individual vendee that the waiving of mortgage and conveyance certificates was standard when he knew that the certificates, particularly the mortgage certificate, would disclose information adverse to his interest;
"(8) Placed himself in a position by which giving legal advice to an unrepresented vendee, his personal interests were in conflict with the vendee; and,
"(9) Failed to file the act of sale for nearly four months (La.R.S. 35:281)."
The commissioner concluded that this conduct evidenced a total disregard for the technicalities of law and violated the disciplinary rules. The commissioner noted that the acts described in items 1, 2, 3, 4 and 9 constituted a violation of DR 6-101(A)(3), the acts described in items 5, 7, and 8 constituted a violation of DR 7-104(A)(2), the acts described in items 5, 6, and 7 constituted a violation of DR 1-102(A)(4) and the combination of all the described acts violated DR 1-102(A)(6).
The commissioner recommended that respondent be suspended from the practice of law for two years on account of these violations, this suspension to run consecutively with the suspension recommended in the Shaw matter. The Bar Association concurred in the commissioner's findings of fact and conclusions of law.
Respondent admittedly violated DR 6-101(A)(3) by neglecting legal matters entrusted to him, including delayed filing of one set of articles of incorporation and failure to file the other, delayed recordation of the corporation's act of mortgage, and delayed filing of Schulz's act of sale. He also admitted his negligence in passing the act of mortgage before completing the incorporation. Nevertheless, these omissions, while giving rise to civil liability for malpractice, did not directly injure Schulz, the party who filed the complaint.[15]
The principal misconduct at issue in this disciplinary proceeding involved respondent's handling of the sale of the property to Schulz without informing her of the existing mortgage on the entire property. Respondent explained that it did not occur to him to disclose the mortgage because of the imminent refinancing under the loan commitment which was to pay off the collateral mortgage. His intention at the time of the act of sale was to pay off the mortgage immediately upon title approval and before Schulz paid the balance of the purchase price, at which time Azcona was to begin construction of their development and of Schulz's day care center.
In handling the sale to Schulz, respondent should either have obtained a partial release of her property concurrently with *567 the sale or should have insisted that Azcona delay the sale until the refinancing of the project and payoff of the collateral mortgage had been completed. Respondent's proceeding with the act of sale without taking these precautions caused Schulz's property to be encumbered by an existing mortgage of which she was not informed. His antecedent negligence in handling the incorporation further caused Schulz's property to be subject to an incurable title defect (which would probably not be a title problem under the clarified present law), even if the collateral mortgage had not existed. Finally, the situation was worsened because neither the seller-corporation nor respondent was in the financial position to immediately refund the purchase price to Schulz when the title defect eventually surfaced.[16]
This misconduct in handling the sale to Schulz arguably constituted malpractice for which respondent confessed judgment in the civil action. Nevertheless, the Bar Association's evidence as to this misconduct was as equally consistent with a high degree of negligent inattention to details (related to emotional problems discussed in the penalty section) as with intentional misrepresentations and dishonest conduct reflecting on respondent's moral fitness to practice law. One cannot reasonably conclude under the circumstances of this case that respondent intended by his acts or omissions to cause a loss to Schulz. It was against respondent's own interest to create the title defect in the property which ultimately caused Schulz's damages. As to the bungled sale, respondent had contact with Schulz on only one occasion, Azcona having handled all negotiations and arrangements for the sale to Schulz and the construction of her portion of the development. We conclude that there was no proof by clear and convincing evidence of violations of DR 1-102(A)(4) and (6).
Nor was there clear and convincing proof of violations of DR 7-104(A)(2). The record is very unclear as to the specific discussion of the waiver of mortgage certificates, and the discussions at the sale principally concerned the imminent developments of both portions of the property. On this record we cannot say that respondent gave advice to Schulz regarding mortgage certificates during the course of his representation of another party when there was an apparent conflict with the interests of respondent's client. Moreover, the failure to disclose the existing mortgage would have been mooted by the already approved refinancing, but for the title problem. Finally, even if the collateral mortgage problem had never existed, the real injury to Schulzpurchasing property with an incurable title defectoccurred because of negligent conduct by respondent which clearly did not involve moral culpability.
Penalty
In the Shaw matter several parties shared the responsibility for cancelling the note and mortgage by ex parte motion without depositing the proceeds of the balloon payment into the registry of court.[17] All of the attorneys who participated in the withdrawal of the note should have known that the ex parte motion was highly improper, as previously discussed. Nevertheless, the party (Shaw) who should have been notified of the motion would not have suffered any substantial prejudice if the $250,000 proceeds of the balloon payment had been deposited into the registry of court in the concursus proceeding.[18] Indeed, the attorney for the recorder of mortgages testified that he could not envision why any mortgagor who wished to pay off a mortgage note in the registry of court would be prevented from doing so, and the *568 trial judge essentially agreed with this observation.
Admittedly, respondent should have either utilized a contradictory motion or ensured that the proceeds of the balloon payment were deposited into the registry of court. However, all of the attorneys shared in the responsibility for the improper ex parte motion. While respondent negligently failed to ensure that the proceeds were deposited into the registry of court, Azcona's brother's attorney's action in disbursing the proceeds to Shaw's prejudice was at least as equally culpable. Because that attorney received only a public reprimand (for failing to review the motion and order before disbursing the funds), we conclude that respondent's penalty for similar misconduct should be approximately the same, without reference to mitigating or aggravating circumstances.
In the Schulz matter respondent, by his actions and omissions, led Schulz to believe that she had purchased unencumbered property, after respondent had created a title defect which prevented the refinancing necessary to pay off the existing mortgage. Respondent would not have been caught in this bind if he had arranged for a partial release before passing the sale or had delayed the sale until the refinancing was completed. But, as noted earlier, the real damage occurred because the property purchased by Schulz was subject to an incurable title defect caused by respondent's negligence which occurred long before the act of sale.
Schulz's substantial damages were caused by respondent's repeated neglect of legal matters entrusted to him. Because the neglect was serious and occurred over an extended period of time, suspension (in addition to civil liability) is an appropriate sanction.
In mitigation the commissioner noted that respondent had enjoyed an excellent reputation in seventeen years of practice prior to the misconduct in these two matters which culminated between March and June of 1985. Respondent had undergone a bitter divorce which brought on psychological problems and resort to excessive use of alcohol in 1984 and 1985. Of course, everyone has personal problems, and misconduct cannot be excused on this basis.[19] But on the positive side, as the commissioner observed, respondent confronted his problems by submitting himself to the New Freedom Institute on January 16, 1986, and his rehabilitation has been continuing since that time.
Another significant factor in mitigation is that respondent quickly agreed to indemnify Schulz's entire loss after the title problem was discovered, and he eventually did make restitution, although not until after she had filed a civil action and a disciplinary complaint.[20] Moreover, respondent had no selfish motive or financial gain at stake in the Shaw matter, and in the Schulz matter his mishandling of the incorporation, which was the ultimate cause of Schulz's damages, caused even greater damages to respondent himself.
The principal aggravating factor is respondent's prior disciplinary offense in Louisiana State Bar Association v. Klein, 511 So.2d 1137 (La.1987), in which respondent was suspended for three months for mishandling a personal injury settlement that involved no ultimate loss to the client. However, the misconduct in the earlier case, which occurred in February, 1985 (shortly before the misconduct in this case), essentially formed a part of a continuing course of conduct during respondent's temporary period of substandard lawyering caused in part by emotional problems and alcohol abuse. In that respect respondent has already been punished in part for that course of conduct. Moreover, because the misconduct in the prior case (which might have been consolidated with the present proceeding) was virtually contemporaneous *569 with the present misconduct, this situation is different from that in which a lawyer is suspended for misconduct and later commits new and unrelated acts of misconduct. Compare Louisiana State Bar Association v. Thierry, 520 So.2d 410 (La.1988).
Considering the entire course of respondent's misconduct during the pertinent time frame, including the conduct and the penalty in the previous case, along with the mitigating circumstances in the present case, we conclude that a suspension of six months is the appropriate penalty.
Decree
For these reasons, it is ordered that Henry Klein be and his is hereby publicly reprimanded for his violations of the Code of Professional Responsibility in the Shaw matter. It is further ordered that Henry Klein be suspended from the practice of law for six months from the date of finality of this judgment for his violations in the Schulz matter. Respondent is to bear all costs of this proceeding.
WATSON, J., concurs in part and dissents in part, assigns reasons.
MARCUS, J., dissents and assigns reasons.
WATSON, Justice, concurring in part and dissenting in part.
I concur with the sanction assigned in the Schulz matter, but I respectfully dissent in the Shaw case. This violation was much more serious in my view than the majority concludes and I would favor a considerably more severe sanction.
MARCUS, Justice (dissenting).
It is my opinion that respondent's conduct in the Shaw and Schulz matters warrants a more severe penalty. I would impose a suspension from the practice of law for a period of two years as recommended by the Commissioner and the Committee on Professional Responsibility.
NOTES
[1] The Code of Professional Responsibility was replaced by the Rules of Professional Conduct, effective January 1, 1987. The alleged violations in this case occurred before the effective date.
[2] The transfer from Azcona to Olagues was recorded on August 3, 1983.
[3] The balloon payment had already become due, but had not been paid because of a substantial claim for quanti minoris asserted by the purchaser of the property and a dispute over the accrual of interest after the purchaser was ready and willing to pay the note.
[4] The bank also deposited the sum of $3,800, which represented the final regular installment collected by the bank.
[5] The compromise agreement was signed by Azcona and his brother, the two payees on the note, and by the mortgagor, and was witnessed by their respective attorneys, including respondent.
[6] Respondent's client received $5,000 from Olagues' share pursuant to a loan agreement between the client and Olagues.
[7] The commissioner did not find a violation of DR 1-102(A)(2) and (4) or DR 7-102(A)(7). The commissioner concluded there was insufficient evidence of any affirmative misrepresentation by respondent in presenting the motion to the judge. Respondent's representation that there was no objection from the clerk of court or the recorder of mortgages was accurate, and the signing of the motion by the clients only was not intended to deceive or to shield counsel from connection with the activities. Finally, the commissioner noted that the motion, although incomplete because of the failure to refer to the distribution of the funds, was not significantly improper. Had the funds been deposited into the registry of court, no party would have been prejudiced.
[8] DR 7-102(A)(1) refers to conduct when the attorney knew, or when it was obvious, that the action would serve "merely to harass or maliciously injure another". There has been dispute whether an objective or subjective standard should be applied to this rule and criticism that this rule makes cases of mixed motivation or mixed effect especially difficult. G. Hazard & W. Hodes, The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct § 3.1 (1988).

The use of the word "merely" should be viewed as precluding any motivation or action on the part of the attorney performing the conduct other than the sole intent to harass or maliciously injure another. Therefore, in determining whether there was a violation of this rule, the court should consider the subjective intent of the attorney, as evidenced by the objective factors surrounding the conduct, and ascertain whether the single purpose of the conduct was to harass or maliciously injure another.
[9] As part of the development, Azcona was to construct the building for Schulz on her portion of the property. She was to obtain her own financing.
[10] Because Schulz did not have the full amount of the purchase price when she appeared in respondent's office to sign the act of cash sale, respondent had her execute a contemporaneous act of mortgage. He held the mortgage without recording it and destroyed it when the balance of the purchase price was paid several weeks later.
[11] At the time of the sale to Schulz, the project for developing the property had proceeded to the point where the prospective lender for the refinancing had already contacted the bank which held the collateral mortgage to determine the payoff amount.
[12] Under the present La. R.S. 12:25.1, enacted in 1987, when immovable property is acquired in the name of a corporation prior to its legal existence, subsequent incorporation is retroactive to the date of acquisition. Under this law the tardy incorporation arguably would not have created a title defect.
[13] Respondent's personal and emotional problems, aggravated by excessive use of alcohol, contributed to respondent's inattention to his business, as will be discussed in penalty. Respondent first sought professional treatment in January, 1986, about the same time he undertook to straighten out the problems he had created for Schulz.
[14] At the time of the investigatory hearing, title to the overall tract was in the name of the bank, which was attempting to sell the property. Respondent proved an agreement with the bank whereby the property was listed for sale and respondent was to receive any amount of the sale proceeds that exceeded the bank's interest, but was to pay the bank the deficiency if the sale price did not equal the bank's interest.
[15] Respondent's delayed filing of the incorporation documents indirectly injured Schulz by creating the title defect which prevented the refinancing intended to pay off the collateral mortgage. Of course, the title defect would also have appeared in Schulz's chain of title, even if the collateral mortgage problem had never occurred.
[16] To his credit, however, respondent quickly pledged to indemnify Schulz for her damages upon learning of the defect and eventually did so.
[17] The commissioner noted as a mitigating circumstance that the "conduct of opposing counsel and the Court, the attitudes of other counsel, and the reaction of the clients in the Shaw case encouraged resorting to an ill-conceived and improper plan to secure relief".
[18] Of course, the $24,000 offset to the mortgagor, resulting from the compromise to which Shaw was not a party, reduced the proceeds to that extent, but any prejudice resulting from this compromise is questionable.
[19] This is not a case of alcoholic psychosis caused by chronic alcoholism, as in Louisiana State Bar Association v. Longenecker, 532 So.2d 1143 (La.1988).
[20] Shaw, of course, suffered a potential loss that respondent did not attempt to compensate. Respondent's counsel informed the court at oral argument that Shaw subsequently obtained a judgment in the civil damages action.